UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

DEBBIE A. BUCKLEY                          CIVIL ACTION NO. 06-1625

VS.                                        JUDGE MELANÇON

MICHAEL J. ASTRUE,                         MAGISTRATE JUDGE METHVIN
COMMISSIONER OF SOCIAL SECURITY

REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's unfavorable disability finding.

Considering the administrative record, the briefs of the parties and the applicable law, it is

recommended that the Commissioner's decision be **REVERSED**.

*Background*

Born on January 22, 1960, Debbie Ann Buckley ("Buckley") is a 48-year-old claimant

with a high school education.  (Tr. 37, 353).  Buckley has worked in the past as a dental assistant

and sales clerk (Tr. 20, 359).

Buckley was last insured on June 30, 1999 for Title II disability benefits and on

December 31, 2000 for Medicare-only benefits.  On September 8, 2003, Buckley filed an

application for disability insurance benefits due to bowel problems, insomnia and joint problems

(Tr. 59).  Buckley contends she is disabled by her Systemic Lupus Erythematosus (SLE) and

fibromyalgia.  Her application was denied initially, but an ALJ concluded, without a hearing, that

Buckley was disabled under the Listings for 12.04(A)(B) for affective disorders. The ALJ relied

heavily on the report of consulting psychologist, Dr. Alfred E. Buxton, that Buckley suffered

from Adjustment Disorder with Mixed Anxiety and Depressed Mood secondary to fibromyalgia

and other disorders causing chronic pain (Tr. 123-125).  The report was dated January 27, 2004,

however, and as the Appeals Council observed in vacating the decision, Buckley's insured status

2

expired for disability benefits on June 30, 1999, and that she did not qualify for Medicare-only benefits after December 31, 2000 (Tr. 166-173).  The Appeals Council directed the ALJ to consider the issues in the case, including whether Buckley was disabled prior to June 30, 1999 for disability insurance benefits or December 31, 2000 for Medicare benefits (Tr. 172).

An administrative hearing was held on January 27, 2006.  In an opinion dated May 6, 2006, the ALJ found that Buckley has a severe combination of systemic lupus erythematosus (SLE) and fibromyalgia; that she is unable to do her past relevant work as a dental assistant and sales clerk; and that she retains the ability to perform sedentary work.  Relying on the testimony of a vocational expert, and using the Grids as a framework for decision-making, the ALJ concluded that Buckley is able to do other jobs in the economy, such as account clerk, payroll supervisor, and collections clerk (Tr. 15-23).  On August 2, 2006, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner from which Buckley now appeals (Tr. 6-9).

### Assignment of Errors

Buckley raises the following errors on appeal: (1) the ALJ erred in failing to find that Buckley  was disabled and entitled to benefits from her onset date of disability until present even though she was receiving Supplemental Security Income benefits at the time of her hearing; and, alternatively, the ALJ erred in failing to find Buckley was entitled to a closed period of disability benefits; and (2) the ALJ erred in finding that Buckley's testimony and complaints of pain were not totally and fully credible.

3

*Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).[1] In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992).[2]

*Findings and Conclusions*

The ALJ concluded that Buckley was not under any disability at any time through the date of his decision, May 6, 2006 (Tr. 23).  He also decided:

> . . . that, based on the application filed on September 8, 2003, the claimant is not entitled to a period of disability or to disability insurance benefits, or to Medicare-only benefits under Title II of the Social Security Act because the claimant has

---

[1] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991).  The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion.  Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision.  Johnson, 864 F.2d at 343.

[2]  The steps are:
1.    If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.
2.    A person who does not have a "severe impairment" will not be found to be disabled.
3.    A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.
4.    If a person can still perform his past work, he is not disabled.
5.    If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

4

> failed to establish the onset of disability before the date last insured for purposes
> of eligibility for disability insurance benefits and Medicare-only benefits (20 CFR
> § 404.315).

(Id.).

Since Buckley was last insured on June 30, 1999 for Title II disability benefits and on December 31, 2000 for Medicare-only benefits, she must establish disability prior to either of those dates.[3]

The ALJ found that Buckley's SLE and fibromyalgia were implicated in the record and her combination of the two was severe (Tr. 16, 19).   Systemic Lupus Erythematosus is a chronic inflammatory connective tissue disorder of unknown cause that can involve joints, kidneys serous surfaces, and vessel walls and that occurs predominately in young women but also in children.[4]

Fibromyalgia is defined as "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause."  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites." Willoughby v. Commissioner of Social Security, 332 F. Supp.2d 542, 546 n3 (W.D.N.Y. 2004) *citing* Stedman's Medical Dictionary 671 (27th ed.2000).  The Fifth Circuit has noted:

> The National Institutes of Health state that a person suffering from fibromyalgia
> may experience trouble sleeping, morning stiffness, headaches, painful menstrual

---

[3] *See* 20 CFR §§ 404.130, 404.131, 404.132 and 404.135.

[4] The Merck Manual of Diagnosis and Therapy 426  (Mark H. Beers, M.D. and Robert Berkow, M.D., et al. Eds., 1999).

5

periods, tingling or numbness in hands and feet, and problems with thinking and
memory. The causes of fibromyalgia are unknown. Nat'l Institutes of Health,
"What Is Fibromyalgia? Fast Facts: An Easy-to-Read Series of Publications for
the Public," March 2005 available at http:// www. niams. nih. gov/ hi/ topics/
fibromyalgia/ FF_ Fibromyalgia. pdf.

Corry v. Liberty Life Assur. Co. of Boston, 499 F.3d 389, 392 (5th Cir. 2007).

Buckley has been treated for joint and muscle pain since at least 1985.  She was
diagnosed with fibromyalgia by Dr. John E. Marshall, a Baton Rouge rheumatology specialist,
who treated Buckley from 2000-2003.  It is unclear when Buckley was first diagnosed with
fibromalgyia.  However, on January 23, 2003, Dr. Marshall examined Buckley.  He notes the
examination is a follow-up of her fibromyalgia, atypical chest pain, urticaria and abnormal
antibody test, specifically that of a positive ANA (Tr. 116).[5]  His impression that date was her
symptoms were primarily fibromyalgia related (Id.).[6]

Likewise, the record is unclear as to her diagnosis of SLE.  In November, 2000, when
Buckley was referred to him Dr. Marshall's his initial impression was:

> . . . the picture would suggest that of underlying connective disease and given the
> coexistence of the rash and the arthralgias. . . one would lean toward the
> possibility of systemic lupus erythematosus but discussed other less likely
> possibilities such as Lyme disease, dermatomyositis, palindromic rheumatism or
> sarcoidosis.

(Tr. 333).

---

[5] "ANA is the abbreviation for "antinuclear antibody." Stedman's Medical Dictionary 66 (27th ed.2000). ANA is
found in "a high proportion of patients with systemic lupus erythematosus, rheumatoid arthritis, and certain collagen
diseases, in some of their healthy relatives; also in about 1% of normal individuals." Id. at 97."  Corry v. Liberty Life
Assur. Co. of Boston, 499 F.3d 389, 393 (5th Cir. 2007).

[6] He did note that it was probable that her chest pain was due to gastroesophageal reflux (Tr. 116).  His impression
was urticaria/urticarial vasculitis; fibromyalgia, and probable gastroesophageal reflux (Id.).

6

John Canterbury, M.D. provided a consultative examination on November 22, 2003 (Tr. 119).  Based on the history Buckley provided, Dr. Canterbury concluded that, although he did not have the associated medical records, it appeared to him that she might have features consistent with both lupus and fibromyalgia (Tr. 122).  Dr. Canterbury noted she had multiple tender pressure points in the suboccipital, trapezius, and intrascapular areas and was on medications that may be used to treat autoimmune diseases (Id.).

The question remains whether the medical records support the conclusion that Buckley suffered from fibromyalgia and/or SLE before her ultimate diagnosis.  After careful consideration of the record, the undersigned concludes that the ALJ's decision that Buckley was not disabled before she was last insured is not supported by substantial evidence.[7]  The ALJ concluded that, despite having lupus and fibromyalgia, Buckley retained the ability to do sedentary work.  This conclusion is not supported by substantial evidence.  Furthermore, the record shows that Buckley suffered from muscle and joint pain as far back as 1985, prior to the expiration of her disability insured status on June 30, 1999.

In a letter to Buckley's counsel dated January 20, 2006, Dr. Michael W. Basile states that Buckley has been a patient at the Family Clinic since 1978.  Dr. Basile summarized Buckley's

---

[7] Buckley argues that the Social Security Administration had already determined she was disabled prior to January 27, 2006, the date of her hearing, as she was receiving SSI benefits based on the same physical and mental conditions at issue in the instant matter.  However, the determination for SSI disability has no relevance in the instant determination.  SSI benefits, authorized by Title XVI of the Act, 42 U.S.C. §§ 1381-1383c, provide assistance to a disabled needy claimant without regard to the claimant's coverage under the Act for disability insurance benefits.  Cieutat v. Bowen, 824 F.2d 348, 359 (5th Cir. 1987).  In contrast, "[f]or a claimant to be eligible for disability benefits, in addition to being disabled he must meet the Act's special insured status earnings requirement." Cieutat, 824 F.2d at 359 n.18 (5th Cir. 1987), relying on 42 U.S.C. §§ 416( 1 )(3), 423(c)(1).  Because SSI benefits are not payable prior to application, the relevant time period for Buckley's SSI claim would begin as of September 8, 2003, the date of her application.  See 20 C.F.R. § 416.335; Sanchez v. Barnhart, No. 02-50968, 75 Fed. Appx. 268, 270, 2003 WL 22121013, **1 (5th Cir. Sept.15, 2003).  In contrast, the issue in the instant matter is whether Buckley met the disability requirements as of June 30, 1999 and/or the medicare requirements on December 31, 2000 (Tr. 18, 19, 171, 173).  Thus, this argument lacks merit.

7

visits in connection with her complaints of pain, particularly joint pain and muscular pain as

follows:

> . . . Ms. Buckley was seen as early April 21, 1985 by Dr. Richard Lafleur with soreness in her neck and headaches radiating into the right shoulder and arm. He felt at that time this was a myositis fibrositis type of syndrome. I saw her on February 27, 1996. At that time, she was complaining of pain in her joints mostly of the left wrist. . . .

> On March 4, 1996, she was seen with complaints of left upper back pain and was felt to have thoracic strain. On January 24, 1997, the patient was seen with recurrent pain in the right elbow, as well as headaches in the posterior neck. On October 8, 1997, the patient was seen by Dr. Pat Gillespie with complaints of fatigue, the right side of her face being numb, as well as headaches. He felt at that time that this was migrainous type headache and a MRI of the brain was done which was within normal limits. On April 26, 2000 the patient was again seen complaining of joint pain in the upper extremities, as well as the neck over the previous 2 weeks and was diagnosed with nonspecific joint pains and treated symptomatically. She was next seen on October 3, 2000, complaining of generalized muscular spasm, more so to her back and shoulders. She was diagnosed with myalgia and repeat arthritis panel was drawn. Antinucleated antibodies showed a homogenous pattern with 1:40 titer. Rheumatoid factor was elevated at 64. IU/ml with negative being less than 39 IU/ml. Sed rate was noted to be high at 21. The patient was referred to Dr. John Marshall in Baton Rouge. According to his report, . . . the patient had a 4-year history of episodic migratory arthralgias and arthritis with a positive rheumatoid factor and antinucleatare antibody. It was elected to undergo further serologic investigation at that time. I do not know what is final diagnosis was as I have no further correspondence from him.

> *In summary, it would seem that Ms. Buckley has had this symptomatology since at least April 21, 1985.*

(Tr. 330-331) (emphasis supplied).

Buckley was also treated at the Family Clinic of Opelousas several other times for pain.

On July 3, 1984, she was seen for headaches, vomiting, and backache. The notes indicate, "pain

in her lower thoracolumbar area; headaches are as she previously had (Tr. 310). She was

prescribed Darvocet (Id.). On January 27, 1993, Buckley complained of mood swings (Tr. 304).

8

On February 10, 1993, her mood swings had improved (Id.)  On June 11, 1993, Buckley was treated for pain in her right neck and trapezius area that had lasted a few weeks (Tr. 303). It was noted that she had some erythematous vesicles which were excoriated on her hands, some between her fingers and some on her palms (Tr. 303).  She was given Advil for her neck (Tr. 302).  On April 7, 1994, she complained of pain in her arm, neck, and shoulders (Tr. 368).

On February 27, 1995, Buckley reported joint pain, mostly in her left wrist (Tr. 396).  Her doctor reported that he would like her to come in the next day for an arthritic survey (Tr. 296). On April 21, 1995, Buckley presented with a "lot of" soreness in her neck and headaches radiating into the right shoulder and leg (Tr. 297).  The report's conclusion was that the soreness was in keeping with a myositis fibrositis type of syndrome (Id.).

On October 12, 1997, Buckley complained of dizziness, wanting to sleep all the time, "had severe headache all day Sunday," and nose bleeds (Tr. 288).

On May 11, 1998, Buckley complained a sinus congestion and being "stressed out" (Tr. 286).  She was given the anti-anxiety medication, Buspar.[8]

Following, her April, 1999 surgery, on May 15, 1999, Buckley complained that her "left arm felt tingling and hand was feeling like it was asleep" (Tr. 276).  On December 3, 1999, Buckley reported dizziness, forgetfulness, feeling slow and increased sleeping (Tr. 273).  The doctor felt it was probably just a little viral URI (Id.).  He felt she was a "little dramatic with her complaint" (Id.).  She was prescribed Claritin D 12 (Id.).

On September 28, 2000, she complained of generalized body aches, tingling to hands, numbness and swelling to legs and feet for three days (Tr. 267).

---

[8] http://www.drugs.com/buspar.html.

9

In November, 2000, upon her referral by Dr. Basile, Dr. Marshall summarizes that Buckley had a four year history of episodic, migratory arthralgias and arthritis who presented with more persistent arthralgias, as well a rash and has been noted to have both a positive rheumatoid factor and anti-nuclear body study (Tr. 332).

On June 11, 2002, Dr. John Kemp, an obstetrician/gynecologist, reported that Buckley was having some problems with autoimmune phenomenon, that she was on Plaquenil[9], and that she did not have a firm diagnosis (Tr. 98). He reported a positive ANA and a positive RA Latex but "doesn't appear to be purely rheumatoid or purely lupus" (Id.). He noted moderate fibrocystic change (Id.).

While Dr. Canterbury's opinion was that her bowel problems, insomnia, joint problems, skin rashes appeared to have begun three years prior to his November 2003 consultative examination, this opinion was rendered in the absence of any medical records.

The undersigned concludes that the medical evidence of record, including the statement of her treating physician, Dr. Basile, shows that she suffered from the symptoms of fibromyalgia and/or SLE, although she was not ultimately diagnosed until some time after 1999. The ALJ, however, concluded that Buckley's condition was not disabling *at any time through the date of his May 6, 2006 decision* (Tr. 23) (emphasis supplied). The ALJ committed error in completely dismissing the validity of a diagnosis of fibromyalgia. The ALJ wrote:

> On the other hand, the undersigned notes that the claimant's ongoing complaints
> of pain appear to be totally subjective as she has never exhibited any motor,

---

[9] Plaquenil may be used, usually with other medications, to treat certain auto-immune diseases (lupus, rheumatoid arthritis) when other medications have not worked or cannot be used. It can reduce skin problems in lupus and prevent swelling/pain in arthritis.
http://www.webmd.com/drugs/drug-6986-Plaquenil+Oral.aspx?drugid=6986&drugname=Plaquenil+Oral.

10

sensory, neurological, reflex or circulatory deficits on clinical examination.  She
has never had verifiable muscle spasms, objective limitations in ranges of motion,
or clinically diagnosed muscle atrophy.  While the establishment of the above
conditions is satisfied for purposes of proving medically determinable
impairments, the undersigned is not as easily persuaded regarding the alleged
*effects* of those impairments. . . .

The problem is enhanced by the fact that the claimant in this case has had many
somatic complaints.  (See Exhibit 10F).  The gist of such involves an individual
who has few measurable physical problems but who is convinced that she has
many such problems and who regularly seeks treatment for those imagined
problems.  *One can readily discern the abject difficulty inherent in efforts to
fathom the severity of physical limitations based upon diagnoses of conditions
such as fibromyalgia in a claimant who suffers from a disorder the central feature
of which is a lack of verifiable physical problems.*

(Tr. 19) (emphasis supplied).

Here, it is clear that the ALJ disregarded the opinions of Buckley's physicians and

discounted Buckley's diagnosis of fibromyalgia, finding her complaints to be imaginary.  His

findings were erroneous since fibromyalgia is an accepted disease classified by the American

College of Rheumatology.  As the court stated in Willoughby, Id. at 546:

Numerous courts have recognized that evaluating the nature and severity of
[fibromyalgia] in the context of social security disability review has proven to be
difficult because of its elusive nature and the lack of objective tests that can
conclusively confirm the existence of the disease.  *See, e.g., Green-Younger v.
Barnhart,* 335 F.3d 99, 108 (2d Cir.2003); *Harman v. Apfel,* 211 F.3d 1172, 1179-
80 (9th Cir.2000); *Kelley v. Callahan,* 133 F.3d 583, 585 n. 2 (8th Cir.1998);
*Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996); *Preston v. Sec. of Health and
Human Servs.,* 854 F.2d 815, 818 (6th Cir.1988).  Nevertheless, despite the lack
of objective medical screening devices, fibromyalgia is a potentially disabling
impairment that can provide the basis for disability insurance and supplemental
security income benefits in the appropriate case. *See Green-Younger,* 335 F.3d at
108-109; *Soto v. Barnhart,* 242 F.Supp.2d 251, 256-57 (W.D.N.Y.2003).

Rheumatology specialist Dr. Marshall ultimately diagnosed Buckley with fibromyalgia.

Further, the record shows that Buckley's impairment began prior to 1999.  Dr. Basile reported

that Buckley has had the symptomatology of her complaints since at least April 21, 1985.

11

Dr. Basile's opinion is consistent with the record as a whole.  Although not conclusive, an evaluation by the claimant's treating physician should be accorded great weight.  Martinez v. Chater, 64 F.3d 172, 175-76 (5th Cir. 1995), citing Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir.1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (U.S.1995).  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence."  20 C.F.R. § 404.1527(d)(2).  Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, "the ALJ has sole responsibility for determining a claimant's disability status."  Martinez, 64 F.3d at 176, citing Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir.1990).  Where there are apparent conflicts in the record between or among medical sources, "the Commissioner, rather than the Courts, must resolve conflicts in the evidence."  Martinez, 64 F.3d at 174.  Thus, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Martinez, 64 F.3d at 176, citing Bradley v. Bowen, 809 F.2d 1054, 1057 (5th Cir.1987) (citation omitted).  However, an ALJ cannot reject a medical opinion without an explanation.  Loza v. Apfel, 219 F.3d 378, 395 (5th Cir. 2000), citing Strickland v. Harris, 615 F.2d 1103, 1110 (5th Cir.1980); Goodley v. Harris, 608 F.2d 234, 236 (5th Cir.1979).

Although the ALJ states that he fully considered the medical evidence of record and "incorporated" it into his opinion by reference, he relies extensively on the testimony of Dr. George Smith (Tr. 18).  The ALJ notes that, "Dr. Smith felt that the presumptive diagnosis was likely to be lupus or arthritis" (Tr. 18).  However, he rejects this testimony, concluding the

12

gist of the matter is that Buckley has "few measurable physical problems but who is convinced she has many such problems and who regularly seeks treatment for imagined problems" (Tr. 19).

Further, Dr. Smith testified at the hearing that, in hindsight, it was possible that her complaints made as early as 1985 were compatible with signs of Lupus or myositis fibrositis syndrome (Tr. 367-368).  The medical records from the Family Clinic show that Buckley repeatedly sought treatment for chronic joint and muscular pain beginning in April, 1985; again in June, 1993; in February and April, 1995; in February and March, 1996; January and October, 1997; in April and then in October, 2000 when she was finally referred to Dr. Marshall. Thus, the undersigned finds that Dr. Basile's opinion that Buckley had had the symptomatology she complains of since 1985 is well-supported by the record.

Moreover, the ALJ's finding that Buckley's complaints are totally subjective as she never exhibited any motor, sensory, neurological, reflex or circulatory deficits on clinical examination is erroneous.  In Willoughby, the district court remanded the case to the ALJ with instructions that the ALJ not:

> simply discount plaintiff's credibility based on the fact that there are no lab results or other objective medical findings to support her testimony about her limitations. The ALJ must consider the fact that there is no clinical test that can identify fibromyalgia or determine its severity. In fact, as a number of courts have recognized, the absence of abnormal clinical*549 signs and findings (such as swollen joints, limited ranges of motion, or weakened muscles) is consistent with a diagnosis of fibromyalgia. *See Green-Younger*, 335 F.3d at 109 ("these negative findings simply confirm a diagnosis of fibromyalgia by a process of exclusion ...."); *Gang v. Barnhart*, No. 02-CV-3647, 2003 WL 22183423, *5-*6 (E.D.N.Y. Sept. 23, 2003) ("a lack of abnormal neurological findings actually confirm[s] a diagnosis of fibromyalgia") (internal quotations omitted); *see also Sarchet*, 78 F.3d at 307; *Preston*, 854 F.2d at 819; *Soto*, 242 F.Supp.2d at 256-57.

Willoughby, 332 F. Supp.2d at 548 -549.

13

Here, the medical records support Buckley's complaints, and the conclusion that she suffered from her severe impairments prior to expiration of her disability insured status. Furthermore, although the decision of the original ALJ was vacated because it did not take into account Buckley's insured status, the decision sheds light on the effect Buckley's medical condition has currently on her ability to work.[10] Relying heavily on the January 27, 2004 consultative examination by psychologist Alfred E. Buxton, the ALJ found there was sufficient evidence to conclude that Buckley met the listing for affective disorders[11] and suffered from the typical mood disorders commonly associated with fibromyalgia since October 31, 2002 (Tr. 161). The ALJ concluded:

> [Buckley] suffers with persistent decreased energy, difficulty thinking and concentrating, sleep disturbance and change in weight. She exhibits marked difficulties in her activities of daily living. She had moderate restrictions with social functioning and moderate limitations with thinking and concentration. As a whole the claimant suffers with an Adjustment Disorder with Mixed Anxiety and Depressed Mood. In addition, the claimant suffers with chronic, severe pain because of fibromyalgia and this contributes to her adjustment disorder.

(Tr. 161). Dr. Buxton's impression was:

> were she to secure gainful competitive employment it is unlikely that she would maintain that employment over a protracted period of time as she would not perform in a reliable and dependable fashion secondary to the negative impact of her physical and mental health problems on her reliability and dependability as an employee. She would break down under the accumulation of everyday frustration and stress and one would see exacerbation in overall symptomatology.. . . If, and when she should demonstrate significant lasting positive improvement in her overall functional status, as revealed through feedback from treating professionals

---

[10] As noted above, the original ALJ found that Buckley met Listing 12.04(A)(B) for affective disorders secondary to her fibromyalgia (Tr. 161), but this decision was reversed by the Appeals Council for a consideration of her disability prior to the expiration of her insured status (Tr. 160-173).

[11] Listing 12.04(A)(B).

14

and interventionists, then a referral to Louisiana Rehabilitation Service for
assessment, training, and job placement would be appropriate. . . .

(Tr. 125).

Buckley provided a detailed history of her problems dating back to the birth of her first

child more than 25 years ago (Tr. 179-190).  She states that her surgery of April 15, 1999 brought

her illness into full force (Tr. 182).  She reports that chronic pain, concentration difficulties,

memory loss, chronic fatigue, irritable bowel syndrome, horrible mood swings, headaches, chest

pains, back and hip pains, rashes, etc. render her unable to work (Tr. 185).

Buckley testified that she worked at the Opelousas General Hospital gift shop in 1999 and

early 2000, on the average of three days a week (Tr. 350-356).  She testified there were some

days she was not able to go in because she was tired and "just didn't feel well.  I just couldn't

keep relating, I felt like I had the flu or something, you know, just no energy just –  (Tr. 361-

362).  Buckley testified that, after her surgery of  April 15, 1999, all of her symptoms came

together and it  "just started to begin to happen all at once" and that she thought she had a

"terminal illness in '99 it was so bad" (Tr. 362).

The evidence of record shows that Buckley's condition is of a chronic and severe nature,

which prohibited her from maintaining employment, beginning before her disability insured

status ended in June, 1999. Buckley has been diagnosed with fibromyalgia by Dr. Marshall.

Buckley's doctors have concluded that Buckley has a medically-based source for her pain.

By January, 2004, her disability was clear when Dr. Buxton opined that Buckley was unable to

maintain unemployment because of her symptoms that cause problems with her reliability and

dependability as an employee.  Although his opinion was rendered in January, 2004, it is equally

relevant to the time period at issue, 1999-2000.  The record shows that she suffered from the

15

symptoms of fibromyalgia as early as 1985, and, thereafter, repeatedly sought treatment for these symptoms - the same symptoms which led the first ALJ to conclude, relying heavily on Dr. Buxton's opinion, "that Buckley suffers from an Adjustment Disorder with Mixed Anxiety and Depressed Mood and suffers with chronic, severe pain because of fibromyalgia and this contributes to her adjustment disorder" (Tr. 161).

Further, when the ALJ questioned whether there were any transferable skills from Buckley's past relevant work to sedentary work, the VE testified she could perform work as an accounting clerk, a collection clerk and/or payroll supervisor (Tr. 371-372).  However, when the requirements of breaks longer than the traditional 15 minutes in the morning and afternoon and an hour lunch were added to the hypothetical, the VE testified that she would not be able to these jobs.  The undersigned concludes that the ALJ's finding that Buckley's symptoms were not disabling prior to 1999 was not supported by substantial evidence and was, therefore, erroneous.

In order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as holding a job in a *realistic* work setting:

> In [Wingo v. Bowen, 852 F.2d 827 (5th Cir.1988)], this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831.  We noted that "[a] claimant capable of performing sedentary or light work under the guidelines must have the ability to perform the required physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world."  *Id.* (*citing* Allred v. Heckler, 729 F.2d 529, 533 (8th Cir.1984)).

Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002).

Considering evidence of record that Buckley suffers from the disabling effects of fibromyalgia and/or SLE beginning in April, 1999, and considering the fact that the vocational

16

expert testified that employers would not tolerate her need to take extended breaks and lunch hours, the undersigned finds that the ALJ's determination that Buckley is able to do sedentary work, and that she failed to establish an onset of disability prior to the last date of her disability insured status, was not supported by the record.  Accordingly, the undersigned finds that Buckley's impairment is disabling and that her disability began prior to June 30, 1999.

*Conclusion*

Considering the foregoing, it is recommended that the ALJ's decision be **REVERSED** and that benefits be awarded consistent with an onset date of April 15, 1999.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) days from receipt of this Report and Recommendation to file specific, written objections with the Clerk of Court.  Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

Any judgment entered herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).  See Richard v. Sullivan, 955 F.2d 354 (5th Cir. 1992) and Shalala v. Schaefer, 509 U.S. 292 (1993).

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal**

17

conclusions accepted by the District Court, except upon grounds of plain error.  See

**Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir.  1996).**

Signed at Lafayette, Louisiana, on March 25, 2008.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)